HEATHER E. WILLIAMS, #122664
Federal Defender
ERIN SNIDER, #304781
Assistant Federal Defender
2300 Tulare Street, Suite 330
Fresno, CA 93721-2226
Telephone: (559) 487-5561
Fax: (559) 487-5950

Attorney for Defendant
MICHAEL GALLOWAY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:14-cr-00114-DAD |
| Plaintiff, | DEFENDANT MICHAEL GALLOWAY'S SENTENCING MEMORANDUM |
| vs. | Date: August 13, 2018 |
| MICHAEL GALLOWAY, | Time: 10:00 a.m. |
| Defendant. | Judge: Hon. Dale A. Drozd |

## I. INTRODUCTION

Michael Galloway is a sixty-three year old veteran, grandfather, and entrepreneur. He has lived a truly fantastic—and sometimes harrowing—life, be it working on Hollywood film productions in his twenties, spending three months in a prison camp in Central America while working for the Agency for International Development, or building a company, WebBasis, into a multi-million-dollar funded venture. Now, as Michael enters his twilight years, he spends his time focusing on his family, his faith, and his passion project, Catholic Online.

Michael stands before this Court having been convicted of four counts of tax evasion, with the last affirmative act of evasion occurring over eight years ago. In the last eight years—four of which Michael has spent on pretrial release—Michael has led a law-abiding life. He has made significant changes to ensure that his mistakes are not repeated and he is taking the monumental step of selling his house so that he can repay the United States government and

finally put this matter behind him.

Michael respectfully requests that this Court sentence him to probation, with any conditions—such as home confinement or community service—the Court deems fit. Such a sentence adequately reflects the seriousness of the offense while still acknowledging the staleness of the conduct Michael is being punished for, the changes he has and will continue to make, his commitment to pay his restitution, and his immense family and community support.

## II.     ARGUMENT

The Court is well-aware of its authority and discretion under 18 U.S.C. § 3553(a), and the defense will dispense with the boilerplate language. A probationary sentence is warranted in this case for a number of reasons.

**A.     The Government's Delay in Filing an Indictment and Subsequent Missteps Mean Michael Now Faces Punishment for Conduct Occurring Over Eight Years Ago.**

The investigation into Michael's income tax returns began with an audit of his 2003 tax return in November 2006. The audit was expanded to include the 2004 and 2005 tax years in early 2007. In April 2008, the case was referred for criminal investigation. Special Agent Brian Applegate was assigned to the case shortly thereafter. A year later, in April 2009, Special Agent Applegate notified Michael that he was under criminal investigation. For over five years, Michael had to live under the cloud of that criminal investigation.

While the statute of limitations would ordinarily have run on the 2003, 2004, and 2005 tax years by October 2012, the government was able to start anew the statute-of-limitations clock on February 23, 2010, when Special Agent Applegate interviewed Michael about his income tax returns. As the jury later concluded, Michael made a false statement during the course of this interview—he purportedly told Special Agent Applegate that he had used cash, saved up over forty years, to make his mortgage payments.

Over six years after Special Agent Applegate began his investigation and over four years after the February 2010 interview, the government finally filed an indictment against Michael, alleging that he owed more than $234,000 in taxes. During the next four years—during which Michael was under the supervision of Pretrial Services—the defense had to litigate issues

Galloway: Sentencing Memorandum

relating to the statute of limitations; a missing administrative summons (which was miraculously discovered after the defense filed a second motion relating to the lack of a summons); and two errors Special Agent Applegate made in calculating the amount of tax due and owing (which shaved over $100,000 off the number alleged in the Indictment).

The defense is not trying to relitigate any of these issues or cast doubt on the jury's determinations that the government's case was not barred by the statute of limitations. Those issues have been settled at this time. The point is that Michael has had to live under the threat of imprisonment for nearly nine years—since he first learned about the investigation in April 2009. He has watched his grandchildren grow, knowing that there could come a time he would have to leave them to serve a prison sentence; he has continued building and expanding his company, knowing that he may not be there to see the fruits of his labors; he has cared for his aging mother, knowing he might not be there with her at the end; and he has seen his wife struggling with early onset dementia, knowing that he may not be there with her when she needs him most. For nine years, he has had to live with this stress and anxiety.

In addition to the emotional toll this case has taken on Michael (and his family), Michael has had to live with the restrictions of pretrial release for over four years. While his conditions may not be particularly onerous, they have prevented him from doing the things that he wants to do. For instance, in January 2017, Michael was invited to a celebration in Washington D.C. but was unable to attend because of the condition prohibiting out-of-district travel. Despite his occasional disappointment with his restrictions, Michael has fully complied with those restrictions for over four years without a single pretrial release violation. *See* Presentence Investigation Report, ¶ 2.

While Michael has complied with his pretrial release conditions for over four years, he has been law-abiding much longer than that. As the jury concluded, the last affirmative act of evasion occurred on February 23, 2010. Since then, Michael has had no new offenses. For the last eight years, he has demonstrated that a lengthy prison sentence is neither necessary to deter him from future criminal conduct nor necessary to protect the public from future crimes. *See United States v. T.M.*, 330 F.3d 1235, 1240-41 (9th Cir. 2003) (striking special conditions

"predicated upon twenty-year-old incidents" because "[t]he fact that [the defendant] has lived the last twenty years without committing a sex offense suggests that he no longer needs to be deterred or shielded from the public"); *see also United States v. Scott*, 270 F.3d 632, 636 (8th Cir. 2001) ("[T]he special conditions seem unlikely to serve the goals of deterrence or public safety, since the behavior on which the special conditions are based, though highly reprehensible, has ceased."). Indeed, by itself, Michael's current age suggests that the risk of recidivism is incredibly low. According to a recent United States Sentencing Commission report, older offenders have a low risk of reoffending. U.S.S.C., *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 23 (Mar. 2016). For those offenders who are older than sixty at the time of sentencing, the rearrest rate falls at just 14%. *Id.*; *see also* U.S.S.G. §5H1.1 (noting that a downward departure may be warranted on the basis of age).

All of the foregoing is relevant to this Court's sentencing determination. The delays in this case—both in filing the Indictment and bringing the case to trial—mean that Michael has already suffered a significant penalty. He has endured nine years of stress and anxiety waiting for closure and he has successfully completed four years of pretrial release. These delays are also relevant in assessing the goals of sentencing. Given Michael's compliance with the law for the last eight years, it is difficult to imagine how justice is served by a sentence of imprisonment.

**B.   Michael Has Taken Significant Steps to Ensure He Will Not Repeat His Mistakes and to Repay the United States Government.**

The defense never disputed that Catholic Online's finances were disastrous during the years in question. There is simply no denying that the QuickBooks records were wrong and there was no bookkeeper or Certified Public Accountant providing adequate oversight. Michael has sought to change this. Although his efforts to restore order to the accounting department began long before the jury returned its verdicts, his convictions in this case were truly a wakeup call. Michael has come to realize that he is not able to handle the financial side of his business. Accordingly, he has turned over financial control of Catholic Online to his wife, who is now the sole managing member of the company. *See* Exhibit A (letter notifying Chase Bank that Sandra Galloway is Catholic Online's sole managing member and Business Depository Certificate

naming Sandra Galloway as sole "Authorized Person").

Furthermore, Michael and Sandra are working closely with Brian Hill, a Certified Public Accountant, to ensure that they are in compliance with the Tax Code. Michael and Sandra first hired Mr. Hill in 2011 and he has been preparing their tax returns since. Mr. Hill is well aware of this case. Indeed, he has spoken with the undersigned and even reviewed some of the discovery. Mr. Hill, thus, is in a unique position to ensure that Michael and Sandra do not repeat the same mistakes.

As part of their efforts to get a better handle on their finances, Michael and Sandra have decided to sell their home and use the equity to pay down their debts, including the $128,182 Michael will owe as restitution in this case. *See* Exhibit B (Residential Listing Agreement). This was a difficult decision for Michael and Sandra. They have owned their home—their dream home—since 2000. It is the home where they raised their children and their grandchildren and it is filled with happy memories. But Michael wants to truly put this case behind him and, in order to do so, he needs to be able to repay the United States government. Although Michael and Sandra just signed the Residential Listing Agreement and, thus, they do not yet have the sale proceeds to apply toward Michael's restitution obligation, Michael has borrowed money from family and is prepared to make a $5,000 payment toward restitution on the day of his sentencing hearing.

Michael's efforts to better himself have not been limited to reevaluating his finances and his role within Catholic Online. Michael's family and friends have long suspected that Michael suffers from mental health issues. After serving in the military, Michael worked for the Agency for International Development for four years in the 1980s in Central America. As verified in the Presentence Investigation Report, Michael was captured by rebels in Guatemala and held prisoner for three months. *See* Presentence Investigation Report, ¶ 76. Michael does not talk much about his time in Central America, although he has shared enough for his family and friends to know that he was tortured. *See* Exhibit C at 2 (letter from Sandra Galloway); Exhibit D at 2-3 (letter from Wendy Caine). After Michael returned from Central America, Sandy noted some changes in Michael. He suffered from severe claustrophobia, and she believed he also

exhibited signs of Post Traumatic Stress Disorder ("PTSD").

Michael's friends, too, have taken note of his claustrophobia and share Sandra's suspicion that he suffers from PTSD. For instance, Wendy Caine, who has known Michael since 2008, writes in her letter to the Court that Michael "has an abject fear of anyone close to his head, or having his head enclosed." Exhibit D at 2 (letter from Wendy Caine). As Wendy writes, this fear has made going to the dentist a particularly terrifying prospect, with Michael even resorting to pulling out his own molar with plyers to avoid a visit to the dentist. *Id.* Wendy saw firsthand Michael's response to being in a dental chair when she accompanied him to have an infected tooth removed:

> The Dentist had prescribed him a low dose of Xanax to take 30 min prior to arrival at the office. Michael only took ½ of the pill, as he does not like to feel out of control, he does not drink alcohol either. Upon going into the small exam room, Michael could not sit in the chair, he paced in the tiny space. When the Dentist and assistant came into the room, Michael[']s pupils dilated in a sympathetic nervous response and he was franticly looking around to escape. Myself and the Dentist convinced him to take the other half of the Xanax. The Dentist left, and 2 of the assistants and I spoke softly to him to calm him. After the effect of the medication was working and he was calmer, he did sit in the chair. At least 45 minutes had gone by. The [D]entist came back and it took another 30-40 min of explanation that with freezing he would be ok. The Dentist agreed not to use a dental dam, and gave Michael the suction to hold.

*Id.*

Although Michael has leaned on friends like Wendy from time to time, he has always been reluctant to admit that he has mental health problems and he has always sought to deal with his issues "without worrying any of his family." Exhibit C at 2 (letter from Sandra Galloway). However, when the draft Presentence Investigation Report was released and Michael saw Sandra's comment that she believed he suffered from PTSD, Michael began to truly reflect and, for the first time, he decided to reach out for help. He made an appointment at the Veterans Affairs ("VA") clinic and, after jumping through the bureaucratic loopholes that dog the VA, he was finally able to have an evaluation, after which he was diagnosed with PTSD. Exhibit C at 2 (letter from Sandra Galloway). Michael has begun attending weekly counseling sessions, and Sandra is hopeful that "this treatment will help Michael to relieve some of the stress and anxiety

he suffers from." *Id.* Nevertheless, she remains concerned that a sentence of imprisonment would be more difficult for Michael than most, given his claustrophobia and PTSD: "Handling these issues at home is hard, let alone trying to deal with them in a confined environment." *Id.*

As noted above, it has been eight years since the last affirmative act of evasion, as found by the jury. Much has happened during those eight years. Michael has made monumental efforts to remedy the problems that led to the offenses; he is selling his home so that he can promptly repay the government and, after nearly a decade, put this matter behind him; and he is working on getting a better handle on his mental health issues. A sentence of imprisonment would disrupt the progress that Michael has made, including interrupting his mental health treatment.

**C.    Michael's Family and Employees Rely on Him and His Absence Would Be Profoundly Disruptive to Their Lives.**

Michael married his high school sweetheart in 1973 and, over the last forty-five years, he and Sandra have devoted themselves to raising their family. Despite losing his own father at the age of eleven, Michael somehow knew what it meant to be a father and has fully embraced the role. His children fondly recall him taking them swimming or to Dodger's games, and they recognize the hard work and sacrifices he made to ensure that they could attend Catholic school and have everything they needed and wanted growing up. *See* Exhibit E at 1 (letter from Ethan Galloway); Exhibit F at 1 (letter from Joshua Galloway); Exhibit G at 1 (letter from Haley Galloway); Exhibit H at 1 (letter from Makenna Alejandre). He also instilled in them a strong work ethic, which has enabled them to succeed in adulthood.

As Michael and Sandra got older, they had the joy of not just being parents but also grandparents. Michael's support over the years has been boundless, whether it is helping his youngest daughter Haley install new flooring in her first home, *see* Exhibit G at 1-2 (letter from Haley Galloway); offering advice and babysitting services while Ethan struggled with his premature daughter's health issues, *see* Exhibit E at 2 (letter from Ethan Galloway); "countless[ly] . . . shift[ing] his daily schedule so he can attend every awards assembly for his children and grandchildren to make sure everyone always had a family member present," Exhibit

Galloway: Sentencing Memorandum

7

1 F at 1 (letter from Joshua Galloway) and Exhibit I at 3 (photograph of Michael with his
2 granddaughter at an award's assembly); or buying his oldest granddaughter a car "so she could
3 make it to class on time while starting her first year of college on her long journey to become a
4 nurse," Exhibit F at 1 (letter from Joshua Galloway). At least a few grandchildren find their way
5 to Michael and Sandra's home every weekend, where Michael enjoys spending time with them
6 doing jigsaw puzzles, coloring, or reading.

7 Michael has also been a frequent source of support for his mother, Rachel, who the Court
8 saw testify at trial. Rachel notes in her letter that, after Michael's father passed away, she tried
9 to convince Michael that he did not need to take on the stress of being the "man of the house."
10 Exhibit J at 1 (letter from Rachel Galloway). Michael nevertheless stepped up and "took it very
11 seriously to take care of his brother and baby sister." *Id.* Rachel, who is now eighty-five years
12 old, continues to rely heavily on Michael for assistance. *Id.* Until recently, she lived with
13 Michael, who helped her raise her grandson (Michael's nephew). *Id.*

14 As Sandra gets older, Michael recognizes that he is going to need to take care of her as
15 well. Sandra's father passed away after a long battle with dementia and her brother, Joseph, has
16 now been diagnosed with early stages of Alzheimer's and dementia. *See* Exhibit K at 1 (letter
17 from Mary Ellen Simmerman). Sandra's sister-in-law sees in Sandra many of the same
18 symptoms Joseph suffers from, and Sandra herself is concerned that she, too, is developing
19 dementia. *See id.*; *see also* Exhibit C at 2 (letter from Sandra Galloway).

20 It is not just Michael's family who rely on him. Although Michael has stepped away
21 from the financial side of Catholic Online, he remains the driving creative force of the company,
22 which currently employs twenty people. Under Michael's leadership, Catholic Online has grown
23 to over one million pages of content with twenty million visitors per week; Catholic Online
24 School, a relatively new feature of Catholic Online, had 10,000 students sign up for the first
25 week; and Catholic Online's YouTube channel, which includes daily readings by Reverend
26 Deacon Keith Fournier, has 62,500 subscribers. *See* Exhibit L at 2 (letter from Marshal Neal).
27 As Marshall Neal, a Catholic Online employee, writes in his letter to the Court: "We cannot
28 replace Michael Galloway. There is no person who has the same love, devotion, or experience to

fill his post within the company." *Id.* at 1. The prospect of Michael's absence has caused concern for his employees, who cannot fathom how the company would continue to operate without him. *Id.* at 1; *see also* Exhibit D at 2 (letter from Wendy Caine).

Family ties and responsibilities—while also a basis for a downward variance under 18 U.S.C. § 3553(a)(1)—are specifically listed in the Guidelines as a basis for a downward departure. *See* U.S.S.G. §5H1.6. Section 5H1.6 explains that a Court may consider the "loss of caretaking or financial support of the defendant's family." U.S.S.G. §5H1.6, comment. 1(a)(B). Despite §5H1.6's suggestion that the departure should be reserved for rare cases, courts have frequently cited family ties and responsibilities as a basis for departure. For instance, according to recent data available on the United States Sentencing Commission's website, there were a total of 67,742 cases where a sentence was imposed in the 2016 fiscal year. USSC, *Interactive Sourcebook of Federal Sentencing Statistics*, Table 25B, *available at* https://isb.ussc.gov/Login. Of those cases, 3,289 defendants received a downward departure under U.S.S.G. §5H1.6 for family ties and responsibilities—the sixth most cited reason for a below-Guidelines sentence. *Id.*

Here, many people rely on Michael—his children, his grandchildren, his mother, his wife, and his employees. For his children and grandchildren, he is a source of emotional support and, on occasion, financial support. For his mother and wife, he is a caretaker and, as his mother's and wife's health conditions decline, that role will become increasingly important. Moreover, nearly all of his children and his wife are employees of Catholic Online. Thus, their financial wellbeing is contingent on Catholic Online's continued operation. As Marshall Neal and Wendy Caine write in their letters to the Court, there is great concern that Catholic Online will not be able to function in Michael's absence. Given Michael's critical role in the lives of his family and employees, a sentence of imprisonment would have far-ranging effects on many people.

**D.   A Probationary Sentence Is Sufficient, But Not Greater than Necessary, to Achieve the Goals of Sentencing.**

As set forth above, in Michael's case, the sentence recommended under the Guidelines is greater than necessary to achieve the goals of sentencing. Michael's case is not an outlier in this

regard—of the 521 tax cases in which a sentence was imposed in the 2016 fiscal year, 393 defendants received a below-Guidelines sentence. U.S.S.C., *Interactive Sourcebook of Federal Sentencing Statistics*, Table 27, *available at* https://isb.ussc.gov/Login. A small portion of those defendants received a reduction for substantial assistance, early disposition, or some other government-sponsored reduction, but the majority (240) received a below-Guidelines sentence based on a departure under the Guidelines or a variance under 18 U.S.C. § 3553(a). *Id.* Indeed, roughly 40% of defendants in tax cases receive probation. U.S.S.C., *Interactive Sourcebook of Federal Sentencing Statistics*, Table 12, *available at* https://isb.ussc.gov/Login.

A probationary sentence is not a mere "slap on the wrist," as popular opinion might suggest, and Congress has recognized the important role that a sentence of probation should play in the arsenal of available choices when fashioning a sentence that furthers both the needs of the defendant and the needs of society. For instance, in the legislative history of the Sentencing Reform Act of 1984, Congress explicitly reacted to what it perceived to be an excessive use of imprisonment "when other types of sentences would serve the purpose of sentencing equally well" and encouraged "the fashioning of conditions of probation in order to make probation a useful alternative to a term of imprisonment." S. Rep. No. 98-225, at 59 (1983). Congress emphasized that "it may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." *Id.* at 92.

And probation does serve a punitive purpose. The United States Supreme Court recognized in *Gall v. United States*, 552 U.S. 38 (2007), that "probation, rather than an act of leniency, is a substantial restriction of freedom." *Gall*, 552 U.S. at 44 (internal quotation marks omitted) (citations omitted). An individual on probation has to comply with strict reporting requirements and loses the ability "to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court." *Id.* (citation omitted); *see also* U.S.S.C., *Sentencing Options Under the Guidelines*, Staff Discussion Paper, at 20 (1996) (noting that empirical studies show that "offenders feel home confinement is at least, if not more,

1   punitive than prison"); Joan Petersilia & Elizabeth Piper Deschenes (RAND), *Perceptions of*
2   *Punishment: Inmates and Staff Rank the Severity of Prison Versus Intermediate Sanctions*, 74
3   Prison J. 306 (1994) (concluding that "inmates viewed one year in prison as 'equivalent' in
4   severity to three years of intensive probation supervision," providing "empirical evidence that it
5   is no longer necessary to equate criminal punishment solely with prison").

6       Moreover, a probationary sentence carries great risk for a defendant. If the Court were to
7   sentence Michael to probation, he would "always face the harsh consequences that await if he
8   violates the conditions of his probationary term." *Gall*, 522 U.S. at 44. In upholding a five-year
9   sentence of probation, which represented a fifteen-level variance, the Ninth Circuit emphasized
10  the deterrent nature of the sentence given that "the district court threatened that if [the defendant]
11  violated any of the conditions of his probation, he would 'be back before me and receive the
12  maximum penalty allowed by law.'" *United States v. Autery*, 555 F.3d 864, 867 (9th Cir. 2009).
13  The Court opined, "[T]here is nothing like being sentenced to hang in the morning to focus a
14  man's thoughts, and it is improbable that the district court's stern warning will be an ineffective
15  deterrent in this case." *Id.*; *see also United States v. Edwards*, 595 F.3d 1004, 1016 & n.9 (9th
16  Cir. 2010) upholding the district court's decision to vary down twelve levels for a sentence of
17  five years of probation with seven months of home detention and noting that "the district court
18  considered probation to carry significant punitive weight . . . [given] that [t]he Probation Office
19  . . . has a very short chain for people like [the defendant] and his liberty is significantly restricted,
20  and [the judge] warned that if [the defendant] did not comply with the terms of his probation,
21  [the defendant] would be sent to the federal penitentiary").

22      A sentence of probation is sufficient, but not greater than necessary, to achieve the goals
23  of sentencing in this case. A probationary sentence adequately addresses the seriousness of the
24  offense, while also recognizing all of the factors discussed above, including the staleness of the
25  conduct, the stress and anxiety Michael has dealt with for nine years as this case was investigated
26  and prosecuted, the changes Michael has made both in his company and in his personal life as he
27  has sought to address his mental health issues, his willingness to sell his house to pay restitution
28  as soon as possible, his significant family responsibilities, and his status as a leader within a

company employing twenty people.  Michael recognizes that probation is no "walk in the park" and that he will be under strict conditions, violation of which could potentially land him in a federal prison.  Nevertheless, Michael is ready to take on the challenges of probation, so that he can continue to receive mental health treatment, care for his family, and be the creative driving force of Catholic Online.

### III. CONCLUSION

For the reasons set forth above, the defense respectfully requests that this Court sentence him to probation, with any conditions—such as home detention or community service—the Court deems fit.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

Date: August 6, 2018         */s/ Erin Snider*
                             ERIN SNIDER
                             Assistant Federal Defender
                             Attorney for Defendant
                             MICHAEL GALLOWAY